Joseph L. **DOMBROWSKI**, Plaintiff-
Appellee,

v.

Jack **DOWLING** and Arthur **Rubloff**
& Co., Defendants-Appellants.

No. 71–1147.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1972.

Decided April 7, 1972.

Robert S. Cushman, Richard S. Ratcliff, Jeffrey G. Liss, Chicago, Ill., Price, Cushman, Keck & Mahin, Chicago, Ill., of counsel, for defendants-appellants.

Jeffrey Schulman, George B. Collins, Chicago, Ill., Collins & Amos, Chicago, Ill., of counsel, for plaintiff-appellee.

Before HASTINGS, Senior Circuit Judge, and STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

The outcome of this litigation depends on three critical issues: (1) whether obnoxious discrimination by a private business is proscribed by § 2 of the Ku Klux Klan Act of 1871[1]; (2) whether the Brunswick Building is a "public accommodation" within the meaning of § 201(b) (4) of the Civil Rights Act of 1964[2]; and (3) whether defendants refused to rent space in that building to plaintiff because of the race of a large portion of his clientele. To place the issues in proper focus, the proceedings in the district court must be described.

Plaintiff is a white lawyer with a successful criminal practice. Defendant Arthur Rubloff & Co. is a corporation engaged in the management of real properties; as an employee of Rubloff, defendant Dowling is responsible for the management of the Brunswick Building.

On July 17, 1970, plaintiff filed a complaint in the district court alleging that he had been invited to rent offices in the Brunswick Building, that the proposed space and terms were acceptable to him, but that upon "being advised . . . that a substantial number of his clients were of the Black race or of Latin origin," defendants interrupted the rental discussions and ultimately refused to rent to him. He alleged that the acts of the defendants were part of an unlawful conspiracy to deny him rights secured by the Constitution and violated his statutory right to equal enjoyment of the facilities of a place of public accommodation. He invoked federal jurisdiction under several sections of the civil rights statutes, including 42 U.S.C. §§ 1985(3) and 2000a.

On July 20, 1970, the district court held an evidentiary hearing on plaintiff's motion for a temporary restraining order. After receiving the testimony of the plaintiff and three executives of Rubloff, he restrained defendants from renting the suite in question to anyone other than the plaintiff until further order of the court.

Subsequently, plaintiff moved for a preliminary injunction and defendant filed a motion for summary judgment. The testimony heard on July 20 comprised almost the entire record in connection with those motions.[3] After considering exhaustive briefs and argument, the court prepared a careful memorandum opinion and entered the order which gave rise to this appeal.

The court first identified the basic conflict in the testimony:

"Plaintiff maintains he was refused space in such building on the grounds his clientele was Negro or Latin-American. The defendants allege that he was refused on the grounds that he practiced criminal law and his clientele would create an additional security risk within the building."

Although it is plain from colloquy and from other portions of his memorandum that the court did not consider the plain-

---

1. 17 Stat. 13, 42 U.S.C. § 1985(3).

2. 78 Stat. 243, 42 U.S.C. § 2000a(b) (4).

3. There were also proceedings involving the request of the Building Managers Association of Chicago to appear as *amicus curiae*, its joinder as a party-defendant, the deposition of two of its executives, and its ultimate dismissal, but those matters are collateral to the issues before us.

tiff's testimony incredible, he made no findings of fact accepting or rejecting either version of the incident. Under his view of the law, such findings were unnecessary; it is fair to state that he assumed *arguendo* that defendants' explanation was accurate.

The court then stated the basic issue as whether the plaintiff had standing under the Civil Rights Acts to complain of discrimination based on the nature of his law practice. To determine that issue, the court considered the applicability of the pleaded statutory provisions to a metropolitan office building. He first pointed out that since defendants did not purport to act under color of state law, the charge under 42 U.S.C. § 1983 was insufficient, and that the definition of a "dwelling" in § 3602(b) did not encompass an office building, and, therefore, § 3604 did not apply. He also concluded that 42 U.S.C. § 1981, which affords Negroes the same rights as whites, could not apply because plaintiff is white. He then considered the two sections which the parties have debated before us: §§ 2000a and 1985(3).

He noted that there was a restaurant in the basement of the Brunswick Building, but held the public accommodation section of the 1964 Act inapplicable because there was "no allegation that plaintiff or his clients [had] been prevented from entering the building to use that restaurant." He concluded, however, that § 1985(3) did apply.

Presaging the Supreme Court's subsequent decision in Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L. Ed.2d 338, he correctly concluded that private conspiracies, as well as conspiracies under color of state law, are covered by § 1985(3). He then held (1) that the facts, viewed in the light most favorable to the defendants, established an arbitrary discrimination against lawyers engaged in the practice of criminal law; and (2) that since there was no allegation that defendant Dowling acted *outside the scope of his authority or without the consent of Rubloff,* they should be treated as conspirators.[4] He denied defendants' motions for summary judgment and sua sponte entered summary judgment in favor of the plaintiff. He granted an injunction but refused to award damages.

Defendants appeal, contending that it was error to grant summary judgment in favor of the plaintiff when the facts were disputed, and that even if plaintiff's interpretation of the facts is correct, no violation of § 1985(3) was proved. Plaintiff argues that the ruling was correct and, in any event, that the evidence established a violation of § 2000a.

## I.

We first reject defendants' argument that the conflict in the testimony necessarily requires a reversal of the summary judgment. The judgment does not rest on a finding of racial discrimination and, under the district court's view of the law, such a finding is unnecessary. Accepting defendants' explanation of their refusal to rent to plaintiff, the court concluded that their discrimination

---

4. In his memorandum opinion the district judge said:
    "Finally, we must consider whether or not the plaintiff has alleged facts sufficient to support a conspiracy. Admittedly, the complaint is directed towards an individual and a corporation, a 'person' only in the eyes of the law. A conspiracy in terms of strict logic between the two would be absurd.
    "In actuality, however, this is not the case, since Arthur Rubloff & Co. is a large real estate management and development company employing hundreds

of people. There has been no allegation that Jack Dowling acted outside of the authority or without the consent of Arthur Rubloff & Co. The complaint, when considered in a motion for summary judgment, must be considered in the light most favorable to the plaintiff, and his allegations must be taken as true . . . . "
The rule that plaintiff's allegations will be taken as true applies, of course, to motions to dismiss and not to motions for summary judgment.

against lawyers engaged in the practice of criminal law was wholly arbitrary and contrary to public policy[5]; he therefore held that plaintiff had been denied the "equal protection of the laws" and "privileges and immunities under the laws" within the meaning of § 1985(3).

For the purpose of our analysis of the statute, we assume that the classification of criminal lawyers, as undesirable tenants is irrational and could not be justified by any compelling, or indeed any legitimate, interest of the defendants. On this assumption, we consider whether the discrimination is proscribed by § 2 of the 1871 Act, now 42 U.S.C. § 1985(3).[6]

Plaintiff does not contend that the defendants acted under color of state law, or that there was any state involvement in the discrimination. Since it is clear that this section covers purely private conspiracies, Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338, it is often assumed that state action is never an element of a § 1985(3) violation. The validity of this assumption is open to some question.

The conduct proscribed by the section is that of "two or more persons." In this case three persons were involved in the discriminatory act: defendant Dowling, who communicated with plaintiff; the witness Brennan, who testified that he made the decision not to rent to plaintiff; and Rubloff, their corporate employer. Since only one firm was involved, and both Brennan and Dowling acted within the scope of their authority as agents for that firm, it is open to question whether the conspiracy requirement of § 1985(3) has been met.

These questions are illuminated by identifying a distinction between the interests of the plaintiff that the statute was enacted to protect and the conduct of the defendants which it proscribes, and by considering the relationship between §§ 1983 and 1985(3), the respec-

5. "Such classification offends the role of the advocate as an officer of the court. No lawyer, although he may well specialize in criminal law, may advertise himself in such specialty. The role of lawyer is to be an advocate on behalf of his client no matter the problem. . . . The building rents to the profession; it must accept the profession in its totality.

"Such classification also offends reason. One might discriminate as easily and as illogically against lawyers practicing bankruptcy law because their clients are poor and might steal, or even against other professions such as doctors whose clients are, by definition, a health hazard, or psychiatrists because their clients are considered by the general public to be insane or mentally disturbed.

"Moreover, such classification offends the very idea behind the due process and the criminal law system existing in our courts under the watchful protection of our Constitution. Simply put, criminals are presumed innocent until proven guilty."

6. That section reads as follows:
"If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

tive lineal descendants of §§ 1 and 2 of the Ku Klux Klan Act of 1871.

Although the point is sometimes obscured or overlooked, § 1983 contains two quite distinct "state involvement" requirements. The first is clearly stated in the statute: the defendants must have acted "under color of" state law.[7] The second inheres in the nature of plaintiff's protected rights: he may not be deprived "of any rights, privileges. or immunities secured by the Constitution and laws." [8] His Fourteenth Amendment right to protection against discrimination extends only to cases in which state action is involved.[9]

Section 1985(3) does not expressly identify any "state involvement" requirement. The most obvious difference in language between §§ 1983 and 1985(3) is the omission from the latter of the "under color of state law" language included in the former. Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338, has squarely held that this omission is significant and that the latter statute applies to purely private conspiracies, whereas the former applies only to conduct under color of state law. The omitted language, however, is directed to the proscribed conduct of the defendants rather than the nature of the plaintiffs' rights which are protected by the statute. Thus, although Griffin makes it perfectly clear that some purely private conspiracies among defendants are proscribed by § 1985(3), Griffin did not purport to delineate the scope of the rights secured by the statute.

With respect to plaintiff's protected interests, the language of §§ 1983 and 1985(3) also differs, but the coverage of the two provisions is probably co-

---

7. *Section 1983 reads as follows:*

   "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

8. The distinction has been clearly identified by Mr. Justice Brennan:

   "To recover under § 1983 petitioner must prove two separate and independent elements: first, that respondent subjected her to the deprivation of a right 'secured by the Constitution and laws'; and, second, that while doing so respondent acted under color of a statute, ordinance, regulation, custom, or usage of the State of Mississippi." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 188–189, 90 S.Ct. 1598, 1619, 26 L.Ed.2d 142 (Mr. Justice Brennan concurring in part and dissenting in part). The opinion of the Court in *Adickes* also plainly identifies the two separate elements:

   "The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.'" 398 U.S. at 150, 90 S.Ct. at 1604.

9. "In analyzing this problem, it is useful to state two polar propositions, each of which is easily identified and resolved. On the one hand, the Fourteenth Amendment plainly prohibits a State itself from discriminating because of race. On the other hand, § 1 of the Fourteenth Amendment does not forbid a private party, not acting against a backdrop of state compulsion or involvement, to discriminate on the basis of race in his personal affairs as an expression of his own personal predilections. As was said in Shelley v. Kraemer [334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161], supra, § 1 of '[t]hat Amendment erects no shield against merely private conduct, however discriminatory or wrongful.' 334 U.S., at 13, 68 S.Ct. at 842." Id. at 169, 90 S.Ct. at 1614–1615.

   In his opinion, Mr. Justice Brennan described the right of plaintiff as " . . . her right under the Equal Protection Clause of the Fourteenth Amendment not to be denied service in respondent's restaurant due to racial discrimination *in which the State of Mississippi was involved,* . . . ." Id. at 188, 90 S.Ct. at 1619. (Emphasis added.)

extensive.[10] Thus, the state involvement aspects of § 1983 cases which are directed to the "protected interests" rather than the "proscribed conduct" portion of § 1983 are relevant in understanding the coverage of § 1985(3). The breadth of the statute's coverage is yet to be determined, but three categories of protected rights have been plainly identified. *Griffin* gives express recognition to a black citizen's Thirteenth Amendment rights [11] and to his federal right to travel interstate; [12] the title of the statute expressly identifies the third category, namely, rights protected by the Fourteenth Amendment.[13] We think the § 1983 cases make it clear that in this third category a "state involvement" requirement must survive *Griffin*.

Since plaintiff is white and claims no abridgement of his constitutional right to travel, the holding of *Griffin* does not control this case.[14] Indeed, the Court expressly noted that it was not deciding "whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable" under § 1985(3).[15] Thus, the Court did not have occasion to consider the effect of the statute on private conspiracies designed to deprive the plaintiff of rights protected by the Fourteenth Amendment.

■ The Court has, however, considered the application of a comparable statute, 18 U.S.C. § 241, in this area. In United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239, the Court sustained an indictment of private citizens who had allegedly conspired to deny Negro citizens their right to equal utilization of public facilities operated by

10. The comparable provisions of the criminal code proscribing private conspiracies, 18 U.S.C. § 241, and individual conduct under color of state law, 18 U.S.C. § 242, have been described as "identical in the scope of the rights they secure." Screws v. United States, 325 U.S. 91, 120, 65 S.Ct. 1031, 1044, 89 L.Ed. 1495 (opinion of Rutledge, J.). See United States v. Price, 383 U.S. 787, 803, 86 S.Ct. 1152, 16 L.Ed.2d 267; United States v. Guest, 383 U.S. 745, 753, 86 S.Ct. 1170, 16 L.Ed.2d 239.

11. "We can only conclude that Congress was wholly within its powers under § 2 of the Thirteenth Amendment in creating a statutory cause of action for Negro citizens who have been the victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men." Griffin v. Breckenridge, 403 U.S. 88, 105, 91 S.Ct. 1790, 1800, 29 L.Ed.2d 338.

12. "Our cases have firmly established that the right of interstate travel is constitutionally protected, does not necessarily rest on the Fourteenth Amendment, and is assertable against private as well as governmental interference. Shapiro v. Thompson, 394 U.S. 618, 629–631 [89 S.Ct. 1322, 1328–1330, 22 L.Ed.2d 600;] *id.*, at 642–644, [89 S.Ct. at 1335–1336] (concurring opinion); United States v. Guest, 383 U.S. 745, 757–760, [86 S.Ct. 1170, 1177–1180, 46 L.Ed.2d 239] and n. 17; Twining v. New Jersey, 211 U.S.

78, 97, [29 S.Ct. 14, 18, 53 L.Ed. 97;] Slaughter-House Cases, 16 Wall. 36, 79–80, [21 L.Ed. 394;] Crandall v. Nevada, 6 Wall. 35, 44, 48–49, [18 L.Ed. 744;] Passenger Cases, 7 How. 283, 492, [12 L.Ed. 702] (Taney, C. J., dissenting). The 'right to pass freely from state to state' has been explicitly recognized as 'among the rights and privileges of National citizenship.' Twining v. New Jersey, *supra*, [211 U.S.] at 97, [29 S.Ct. at 19.]" *Id.* at 105–106, 91 S.Ct at 1800.

13. Although the Act was popularly known as the Ku Klux Klan Act, its formal title was: "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes." 17 Stat. 13. The Supreme Court recently noted that the 1871 Act was passed "for the express purpose" of enforcing the provisions of the Fourteenth Amendment. See Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972).

14. In *Griffin* the Court expressly disclaimed consideration of the extent to which § 1985(3) protects Fourteenth Amendment rights:

"More specifically, the allegations of the complaint in this case have not required consideration of the scope of the power of Congress under § 5 of the Fourteenth Amendment." 403 U.S. at 107, 91 S.Ct. at 1801.

15. See 403 U.S. at 102, n. 9, 91 S.Ct. at 1798.

the State of Georgia. It is a fair distillation of the four opinions filed in that case to state that, although there was disagreement within the Court on the question whether defendants' private conduct would have been proscribed if there had been no cooperative action by state officers, all members of the Court recognized the need for state involvement in the provision of facilities to which the victims of the conspiracy were denied equal access.[16] In short, the right secured by the Equal Protection clause of the Fourteenth Amendment is a right to protection against unequal treatment by a state.

■■ Since the Fourteenth Amendment, unlike the Thirteenth, affords the plaintiff no protection against discrimination in which there is no state involvement of any kind, a private conspiracy which arbitrarily denies him access to private property does not abridge his Fourteenth Amendment rights. We therefore conclude that an arbitrary business discrimination against lawyers engaged in the practice of criminal law does not deprive plaintiff of "equal protection of the laws" within the meaning of § 1985(3) if there is no state involvement whatsoever in the discrimination.

■ We also believe that the statutory requirement that "two or more persons . . . conspire or go in disguise on the highway," is not satisfied by proof that a discriminatory business decision reflects the collective judgment of two or more executives of the same firm. We do not suggest that an agent's action within the scope of his authority will always avoid a conspiracy finding. Agents of the Klan certainly could not carry out acts of violence with impunity simply because they were acting under orders from the Grand Dragon. But if the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by this statute. *Cf.* Morrison v. California, 291 U.S. 82, 92, 54 S.Ct. 281, 78 L.Ed. 664. In this case we believe the evidence fails to establish this element of a § 1985(3) violation.

We therefore hold that the judgment cannot be supported under this statute.

## II.

Defendants contend that summary judgment should be entered in their favor even if the District Judge should find that their refusal was motivated by discrimination against the race of plaintiff's clients. If the Brunswick Building is a "public accommodation" as de-

---

16. "It is a commonplace that rights under the Equal Protection Clause itself arise only where there has been involvement of the State or of one acting under the color of its authority. The Equal Protection Clause 'does not . . . add anything to the rights which one citizen has under the Constitution against another.' United States v. Cruikshank, 92 U.S. 542, 554–555, [23 L.Ed. 588.]" 383 U.S. at 755, 86 S.Ct. at 1176.

"The Court's interpretation of the indictment clearly avoids the question whether Congress, by appropriate legislation, has the power to punish private conspiracies that interfere with Fourteenth Amendment rights, *such as the right to utilize public facilities.*" 383 U.S. at 762, 86 S.Ct. at 1180. (Clark, J., concurring). (Emphasis added.)

"I would sustain this aspect of the indictment only on the premise that it suf-

ficiently alleges state interference with interstate travel, and on no other ground." 383 at 774, 86 S.Ct. at 1186 (opinion of Harlan, J.).

"Whatever may be the status of the right to equal utilization of *privately owned facilities,* see generally Bell v. [State of] Maryland, 378 U.S. 226, [84 S.Ct. 1814, 12 L.Ed.2d 822,] it must be emphasized that we are here concerned with the right of equal utilization of *public facilities owned or operated by or on behalf of the State.* To deny the existence of this right or its constitutional stature is to deny the history of the last decade, or to ignore the role of federal power, predicated on the Fourteenth Amendment, in obtaining nondiscriminatory access to such facilities." 383 U.S. at 780–781, 86 S.Ct. at 1190 (opinion of Brennan, J.). (Emphasis in original.)

fined in the Civil Rights Act of 1964, they are plainly wrong. For in its most recent decision construing that statute, the Supreme Court unequivocally equated discrimination against a person because of his race with discrimination because of the race of his companions.[17]

Plaintiff argues here that the district court improperly concluded that the Brunswick Building is not a public accommodation. We agree that his reasons for rejecting this contention were insufficient because he did not fully consider the possible applicability of § 2000a(b) (4). That subparagraph expands the definition to encompass:

"any establishment (A) (i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment."

The facts which might determine whether the Brunswick Building fits this definition were not developed in the trial court, but defendants have acknowledged that the restaurant on the premises is a "covered establishment." Thus, since the condition stated in part (ii) of clause (A) is satisfied, the issue is whether clause (B) applies.[18] In statutory terms, does the Brunswick Building hold itself out as serving patrons of the restaurant in the building?

The significance of this clause is not entirely clear. There is language in the Supreme Court's opinion in Daniel v. Paul, 395 U.S. 298, 89 S.Ct. 1697, 23 L. Ed.2d 318, that implies that any establishment which serves the public, and which has a public restaurant within it, is itself a public accommodation,[19] and it has been held that a public cafeteria

17. "Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his race or the race of his companions, or in any way act to compel or encourage racial segregation." Adickes v. Kress & Co., 398 U.S. 144, 150–152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142.

18. The district court summarized subsection (4) as "places within such places [as named in subsections (1)–(3)]." He failed to note that § 2000a(b) (4) (A) (ii) also applies, to paraphrase his language, to "places within which there is such a place" if the condition in § 2000a (b) (4) (B) is also satisfied.

19. After finding that a snack bar on the premises of the Lake Nixon Club in Arkansas was a covered establishment, the Supreme Court said:

"The snack bar's status as a covered establishment automatically brings the entire Lake Nixon facility within the ambit of Title II. Civil Rights Act of 1964, § 201(b) (4) [42 U.S.C. § 2000a (b) (4)] and 201(c) (4), set out *supra*; see H.R.Rep.No.914, 88th Cong. 1st Sess., 20; Fazzio Real Estate Co. v. Adams, 396 F.2d 146 (C.A. 5th Cir. 1968)." 395 U.S. at 305, 89 S.Ct. at 1701.

The Court added a footnote:

"Accord: Evans v. Laurel Links. Inc., 261 F.Supp. 474 (D.C.E.D.Va.1966);

United States by Clark v. Fraley, 282 F.Supp. 948 (D.C.M.D.N.C.1968); United States by Clark v. All Star Triangle Bowl, Inc., 283 F.Supp. 300 (D.C.S.C. 1968)."

No specific mention was made in the Court's opinion of the requirement of § 2000a(b) (4) (B) that the major establishment hold itself out as serving patrons of the covered establishment. However, the Supreme Court also found The Lake Nixon Club was a covered establishment under § 2000a(b) (3) as a "place of entertainment." Thus, it did not have to rely on § 2000a(b) (4) and, therefore, its failure to discuss § 2000a(b) (4) (B) should not be taken as an indication that the requirement of that subsection need not be met. In *Fazzio, supra*, there was a snack bar within a bowling alley. The court held that in interpreting § 2000a (b) (4):

"The Act contemplates that the term 'establishment' refer to any separately identifiable business operation without regard to whether that operation is carried on in conjunction with other service or retail sales operations and without regard to questions concerning ownership, management or control of such operations." 396 F.2d at 149.

The court then cited the "holds itself out" language and said:

"[I]f it be found—as it was in this case—that a covered establishment exists within the structure of a unified busi-

in a hospital makes the hospital itself a public accommodation.[20] Moreover, since it is clear that the building could not refuse to rent space to plaintiff because of *his race,* Jones v. Alfred H. Mayer Co., 392 U.S. 409, 423–424, 88 S. Ct. 2186, 20 L.Ed.2d 1189, the prohibition against discrimination against a prospective tenant because of the race of his clients or customers would not constitute a radical departure from settled principles. See Adickes v. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142.

We recognize, however, as defendants argue, that the legislative history of this particular provision contains no express reference to commercial office buildings, and it is not our function to enlarge on the policy determinations of Congress.

It is entirely possible that the issue will turn on factual details which are not now in the record. There is no evidence indicating the extent to which the Brunswick Building "holds itself out" as serving patrons of its restaurant. Findings setting forth the services which the building offers to the patrons of the restaurant, or indeed the part which the restaurant plays in the way the building holds itself out to prospective tenants, may well be relevant to the issue. This much we think is clear: the issue is sufficiently important and difficult that we should not decide it on a partial record. Unless the district court

---

ness operation, then under the provisions of § 201(b) (4) [42 U.S.C. § 2000a(b) (4)] of the Act the entire business operation located at those premises becomes a 'covered establishment.' " *Ibid.*

In that case, the court found the snack bar was "within the structure of a unified business operation" and that the refreshment counter and the bowling alley stood ready to and did serve each other's patrons. *Ibid.* In our case, defendants argue that the restaurant is not "within the structure of a unified business operation" but is merely a tenant in a commercial building like a drugstore, jewelry store, shoe store, or any other commercial tenant. Thus, they argue, the fact that a restaurant patron may work in the building, or that someone visiting a tenant may eat in the restaurant, does not satisfy the "holds itself out" criterion of § 2000a(b) (4) (B). For the reasons set forth in the text, *infra,* we decline to pass on this issue on the present state of the record. The other cases cited by the Supreme Court lend little assistance. In *Evans, supra,* the court did not specifically discuss § 2000a(b) (4) (B) and, in any event, found the golf course a place of entertainment under § 2000a(b) (3). In *Fraley, supra,* the court concluded that a bar did hold itself out as serving patrons of a restaurant. In *Triangle Bowl, supra,* the court also failed to discuss § 2000a(b) (4) (B).

20. United States v. Medical Soc. of South Carolina, 298 F.Supp. 145 (S.C.1969). The court said the cafeteria and snack bar were held out as serving the same patrons as the hospital. Unfortunately, the court failed to discuss the crucial issue under § 2000a(b) (4) (B): Whether the *hospital* held *itself* out as serving the patrons of the snack bar and cafeteria. The fact that it served, in some instances, the same patrons is not conclusive—the issue is whether it "held itself out" as serving the patrons of the snack bar and cafeteria. The converse of this approach is also true: If the hospital holds itself out as serving patrons of the cafeteria, it is irrelevant whether the cafeteria holds itself out as serving "patrons" of the hospital.

In United States v. Beach Associates, Inc., 286 F.Supp. 801 (Md.1968), the court specifically considered § 2000a(b) (4) (B) and properly applied the "holding out" language. It concluded the Beverley Beach Club held "itself out as serving patrons of Bay Carry-Out Shop, Inc., a covered establishment, by supplying the tables at which most of such patrons consume the food purchased at the shop, which provides no such facilities for those customers." *Id.* at 807.

In United States v. Johnson Lake, Inc., 312 F.Supp. 1376 (S.D.Ala.1970), the court while citing *Beach Associates, supra,* and cases cited in note 19, *supra,* failed to note the distinction between the snack bar's "holding out" and the lake establishment's "holding out." It concluded that the lake establishment was covered because there was located on the premises a covered establishment which was "held out as serving patrons of the lake." *Id.* at 1380.

makes the requisite finding of racial discrimination, we need not, and should not, reach the issue.

█ It is possible that after a full trial, both the public accommodation issue and the racial discrimination issue might be resolved in plaintiff's favor. For that reason, defendants' contention that they are entitled to summary judgment must be rejected.

## III.

Plaintiff has also relied on § 1981, and on appeal he relies heavily on Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1180, for the proposition that the Supreme Court has broadly construed 42 U.S.C. § 1982 to prohibit all racial discrimination in the sale or rental of real property.[21] He then argues that § 1981 is a companion to § 1982,[22] and that Adickes v. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L. Ed.2d 142, has obliterated any distinction between discrimination based on a person's race and that based on the race of his associates.[23] The argument glosses over important differences in statutory language,[24] but certainly has force.

21. "Indeed, even the respondents seem to concede that, if § 1982 'means what it says'—to use the words of the respondents' brief—then it must encompass every racially motivated refusal to sell or rent and cannot be confined to officially sanctioned segregation in housing. . . . Our examination of the relevant history, however, persuades us that Congress meant exactly what it said." Jones v. Alfred H. Mayer Co., 392 U.S. 409, 421–422, 88 S.Ct. 2186, 2194, 20 L.Ed.2d 1189. See also Smith v. Sol D. Adler Realty Co., 436 F.2d 344 (7th Cir. 1970).

22. He pleaded § 1981 but did not plead § 1982, and the district court did not have § 1982 before it. This court has determined that the rights of § 1981 are also protected from private racially discriminatory action on the theory that Congress's authority to enact § 1982 under the Thirteenth Amendment, see Jones, supra, n. 21, applies as well to the enactment of § 1981. Waters v. Wisconsin Steel Works, 427 F.2d 476, 481–484 (1970).

23. Why plaintiff relied on § 1981 rather than § 1982 is unclear. Both grant all persons rights "enjoyed by white citizens," so that the interpretive problem of whether racial discrimination means discrimination on the basis of the litigant's own race or can also mean discrimination on the basis of the race of his associates remains. And since the question in this case is a question involving the rental of real property, we are unable to see how plaintiff could have a right under § 1981 if he did not have such a right under § 1982. Thus, we consider the essence of this point as a claim under § 1982.

24. The statute construed in Jones entitles all citizens to the same rights as possessed by white citizens, whereas the 1964 Act broadly prohibits racial discrimination. The Adickes case was predicated on a denial of equal protection, because there was state involvement, under § 1983(2) and (3), which eliminated the "rights enjoyed by whites" problem with the language of §§ 1981 and 1982. Plaintiff relies heavily on Jones v. Alfred H. Mayer Co., 392 U.S. 409, 90 S.Ct. 1598, 26 L. Ed.2d 142. The language in Jones lends some support to plaintiff. The Court said, id. at 421, 88 S.Ct. at 2194, "§ 1982 appears to prohibit all discrimination against Negroes in the sale or rental of property" (italics the Court's). It added, however, "—discrimination by private owners as well as discrimination by public authorities," which would indicate that, by "all," it meant public or private. It said, id. at 426, 88 S.Ct. at 2196, that the section "was meant to prohibit all racially motivated deprivations. . . ." (Italics the Court's.) In context, however, that "all" also appears to refer to public and private. And in another reference, id. at 437, 80 S.Ct. at 2202, the Court said § 1982 purports "to prohibit all racial discrimination, private and public, in the sale and rental of property." The Court proceeded to find the authority of Congress to enact § 1982 in the Thirteenth Amendment. If plaintiff's version of the facts is correct, he was discriminated against not because of his race but because of the race of his clients. The 1964 Act's broad prohibitions are founded, essentially, on the interstate commerce power. If that Act does not apply, whether either the Thirteenth or the Fourteenth Amendment can be read as giving Congress the broad power to prohibit indirect or "associational" racial discrimination by private parties under either § 1981 or § 1982, and whether, even if Congress had the power, it used the proper words to exercise it, are difficult questions which

However, again we should not evaluate the argument until it is necessary to do so in order to determine the controversy between the parties.

In sum, we believe the case must be remanded to the district court for the entry of findings of fact which, if favorable to defendants, may avoid the difficult legal issues, and if favorable to plaintiff, will make it possible to decide those questions on a complete record. To the extent that any party has additional relevant evidence to offer, it should, of course, be received.

The judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

we decline to decide on the record before us. Our opinion in *Waters, supra,* n. 22, is, of course, not determinative because there the question was one of discrimination because of the race of the litigants, not because of the race of their associates.