Yolanda NIETO, Plaintiff,

v.

UNITED AUTO WORKERS LOCAL 598 et al., Defendants.

No. 85–CV–40557–FL.

United States District Court, E.D. Michigan, N.D.

Sept. 1, 1987.

Glen Lenhoff, Flint, Mich., for plaintiff.

John Canzano, Klimisti, McKnight, Sale & McClow P.C., Southfield, Mich., for UAW.

William Mazey, Rothe, Mazey, Mazey & Hamburger P.C., Southfield, Mich., for other defendants.

## MEMORANDUM OPINION

CHURCHILL, District Judge.

This is an action under 42 U.S.C. §§ 1981 and 1985(3). Plaintiff, Yoland Nieto, alleges that eleven members of defendant UAW Local 598, defendants Beardsley, Conley, Ewald, Harris, Greer, Gordon, McMillian, Hayes, Hiltz, Sedar and Henry, conspired and subjected her to race-based and sex-based harassment during one of their work shifts at General Motors. Plaintiff is an hispanic woman of Mexican descent who was employed as a supervisor at the Chevrolet Truck and Bus Plant in Flint, Michigan at the time of the events in question. She is suing the individual defendants as well as the union under sections 1981 and 1985(3). In addition to her federal claims, plaintiff also asserts pendent state claims of assault and intentional infliction of emotional distress against the union and the individuals, and a Michigan Elliott–Larsen Civil Rights Act claim against the union. Local 598 and the individual defendants moved for summary judgment.

There is no genuine issue as to the following facts. All of the individuals named as defendants in this case are committee persons or other officials of defendant UAW Local 598. On September 5, 1985, these individuals proceeded directly from a union meeting to Yolanda Nieto's work station, where the eleven of them surrounded her desk and subjected her to sex-based and race/national origin-based verbal abuse for some fifteen minutes in retaliation for her discipline of a union worker.[1] This type of attack is known in shop parlance as the "wolf pack." The obvious intention of the eleven UAW officials was to drive Yolanda Nieto from her job. Although there is evidence that plaintiff has suffered psychologically from this incident, she has incurred no tangible or pecuniary job detriment and remains employed as a supervisor at General Motors.

### I. The Section 1981 Claim

42 U.S.C. § 1981 provides in pertinent part: "All persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens...." Section 1981 regulates purely private conduct by prohibiting racial discrimination in the mak-

---

1. When the eleven men converged upon plaintiff, they screamed profanities at her, told her they were from the "border patrol," asked for her "green card," called her a "wetback," told her she was illegally in the United States, told her to "go back to Miami," and that they wished the boat she came on had sunk.

ing and enforcement of private as well as public contracts, and has been recognized as "a valid exercise of Congress' power under the Thirteenth Amendment to eradicate the badges and incidents of slavery." *Weaver v. Gross,* 605 F.Supp. 210, 212 (D.D.C.1985) (citing *Runyon v. McCrary,* 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976)).

■ The law is clear that section 1981 prohibits only racial discrimination, not discrimination based on sex or national origin. *Jones v. Continental Corp.,* 789 F.2d 1225, 1231 (6th Cir.1986). Thus plaintiff's allegations of sex discrimination do not state a claim under 1981. In distinguishing between race and national origin based discrimination, the Supreme Court has found it necessary to determine which groups were thought to be of different races in the 19th century when 1981 was enacted. Accordingly, for purposes of section 1981, race has been defined as "a family, tribe, people, or nation belonging to the same stock" in addition to groups with an ethnically distinct physiognomy. *Saint Francis College v. Al–Khazraji,* — U.S. —, —, 107 S.Ct. 2022, 2027, 95 L.Ed.2d 582 (1987). This means that color and other ethnic distinctions, while sufficient, are not necessary to a claim of racial discrimination under 1981, so long as the discrimination is based solely on one's ancestry rather than the place or nation of his origin. *Id.* at —, 107 S.Ct. at 2028. One's ethnic group from which his ancestor's descended, however, may be the same as his national origin where "one was born in the nation whose primary stock is one's own ethnic group." *Id.* at —, 107 S.Ct. at 2028 (Brennan, J., concurring). Justice Brennan reads the Supreme Court's unanimous opinion as logically meaning that discrimination based on *birthplace alone* would fail to state a claim under 1981. *Id.* at —, 107 S.Ct. at 2029. Under Justice Brennan's and this court's reading of *Al–Khazraji,* then, a person of Mexican descent who was born in Poland could be discriminated against because he was born in Poland

without violating 1981, but not because his ancestors were Mexican. As a practical matter, after *Al–Khazraji,* there is no longer a distinction for purposes of 1981 between race and national origin based discrimination.

■ Turning to the present case, even if plaintiff were born in Mexico, which she was not, the ethnic group from which her ancestor's descended would have been the same as her national origin. Therefore, although the verbal harassment was replete with references to green cards, boats, wetbacks and borderpatrols suggesting national origin discrimination, this is racial discrimination within the meaning of section 1981. There is also some evidence that the defendants thought she was Mexican or Cuban from her ethnic features. Finally, among the groups identified as distinct races in the legislative history of 1981 are Mexicans. *Id.* at —, 107 S.Ct. at 2027.

■ Beyond the race/national origin issue is the question of whether a supervisor can state a cause of action under section 1981 against subordinate employees and their labor union, with whom she has no privity of contract. The former Fifth Circuit has long held that privity of contract is not necessary for a violation of 1981 regarding the right to make and enforce contracts. *Faraca v. Clements,* 506 F.2d 956, 959 (5th Cir.), *cert. denied,* 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975) (third party's interference with prospective contract rights prohibited by § 1981). *See also Coley v. M & M Mars, Inc.,* 461 F.Supp. 1073, 1076 (M.D.Ga.1978). In *Faraca,* the court relied on the Supreme Court's ruling in *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) that the right to lease under 42 U.S.C. § 1982 is protected against actions of third parties who interfere with that right, and applied the reasoning to 1981 as well. The conclusion in *Faraca* is sound given that both 1981 and 1982 were derived from the Civil Rights Act of 1866, and that the language of the two sections is almost identical.[2] In *Runyon v.*

---

**2.** 42 U.S.C. § 1982 provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

*McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), the Supreme Court employed similar reasoning in holding that section 1981 like section 1982 applies to purely private acts of discrimination. The *Runyon* court noted that the operative language of both sections is traceable to the 1866 Act, which was designed " 'to prohibit all racial discrimination, whether or not under color of law, with respect to rights enumerated therein' " and concluded that " 'in light of the historical inter-relationship between § 1981 and § 1982 [there is] no reason to construe these sections differently.' " *Id.* at 170–71, 96 S.Ct. at 2594–95 (quoting *Jones v. Alfred Mayer Co.,* 392 U.S. 409, 436, 88 S.Ct. 2186, 2201, 20 L.Ed. 2d 1189 (1968) and *Tillman v. Wheaton–Haven Recreation Assn.,* 410 U.S. 431, 440, 93 S.Ct. 1090, 1095, 35 L.Ed.2d 403 (1973)). Recently, the Third Circuit joined the *Faraca* court in holding that section 1981 prohibits racially discriminatory interference by third persons with the right to make and enforce contracts. *Al–Khazraji v. Saint Francis College,* 784 F.2d 505 (3rd Cir.1986), *aff'd on other grounds,* — U.S. ——, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). In *Saint Francis,* the court opined:

> If the individuals are personally involved in the discrimination against the Appellant, and if they intentionally caused the College to infringe on Appellant's Section 1981 rights, or if they authorized, directed, or *participated in* the alleged discriminatory conduct, they may be held liable.

784 F.2d at 518 (emphasis added) (citing *Sullivan* ). Thus there is strong support for the view that privity of contract is not a prerequisite to liability under 1981.

While courts readily impose personal liability on superiors for discrimination under 1981, the question of the applicability to inferiors has rarely been addressed. In fact, almost all of the reported cases involve corporate superiors as defendants. Once one concludes that privity of contract is not required, however, it follows that the liability of inferiors should be the same as that of superiors, assuming the requisite

discrimination. In *Moffett v. Gene B. Glick Co.,* 604 F.Supp. 229, 235 (N.D.Ind. 1985), the court persuasively wrote:

> While corporate officers, directors, and supervisors have more corporate responsibility and thus more potential to engage in prohibited discriminatory conduct, they are certainly not the only individuals who can "participate in discriminatory conduct" or "discriminatorily interfere with an employee's contractual relationship."

This is a case in point where, although the individual defendants are inferiors in rank, their number and positions in the union enhance their ability to discriminate. Therefore, a supervisor can state a cause of action under 1981 against both subordinate employees and their labor union even though she has no contractual relationship with either of them.

■ Plaintiff essentially has asserted a claim for racial harassment under a "hostile working environment" theory. Whether such a claim exists at all under 1981 must be resolved. Defendants rely on *Patterson v. McLean Credit Union,* 805 F.2d 1143 (4th Cir.1986). In *Patterson,* the court squarely held that a claim for racial harassment is not cognizable under section 1981, contrasting the broad language of Title VII with that of 1981. That case, however, conflicts with the Sixth Circuit's opinion in *Erebia v. Chrysler Plastic Products Corp.,* 772 F.2d 1250 (6th Cir.1985). The *Erebia* court implicitly held that a cause of action for racial harassment exists under section 1981, upholding a verdict for the plaintiff Mexican–American supervisor in an action against his employer for harassment by subordinate employees. The court specifically noted that the case was brought under 1981 and not Title VII. *Id.* at 1256–57.

■ Once recognized, whether the requisites of a 1981 racial harassment claim have been met is a separate inquiry. Section 1981 claims of harassment are generally analyzed identically to Title VII harassment claims. *See, e.g., Erebia, supra.* In

this case plaintiff alleges racial harassment by a group of subordinate employees on a single fifteen minute occasion. There is sufficient evidence to establish that the verbal attack upon her occurred and that it was the result of racially discriminatory intent on the part of the defendants. There is no evidence, however, that plaintiff has incurred a pecuniary or other tangible job detriment, other than emotional or psychological injury. In *Rabidue v. Osceola Refining Co.*, 805 F.2d 611 (6th Cir. 1986), *cert. denied*, ⎯ U.S. ⎯, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987), the Sixth Circuit recognized the possibility that an offensive work environment could, under appropriate circumstances, constitute Title VII sexual harassment without the necessity of asserting or proving tangible job detriment. The court outlined several requirements to establish such a claim including that,

> the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment that affected seriously the psycho logical [sic] well-being of the plaintiff.

*Id.* at 619. That sounds very much like the present case. In support of this, Judge Kennedy's dissent in *Erebia*, while disputing that a single subordinate could dominate a foreman's work environment, acknowledged that the attitudes of a number of co-employees could control one's work environment. 772 F.2d at 1260 (Kennedy, J., dissenting). There is, however, one fatal flaw in plaintiff Yolanda Nieto's 1981 claim. The *Rabidue* court qualified its holding to the effect that plaintiff must "demonstrate that [psychological] injury resulted not from a single or isolated offensive incident, comment, or conduct, but from incidents, comments, or conduct that occurred with some frequency." 805 F.2d

at 620. This is consistent with the *Erebia* case where the harassment took place over a period of five years. Accordingly, where, as here, plaintiff's 1981 harassment claim rests on a single incident, albeit by a number of co-workers, the discrimination does not rise to the level of poisoning the entire working environment so as to violate 42 U.S.C. § 1981.

## II. The Section 1985(3) Claim

In addition to her 1981 claim, plaintiff Yolanda Nieto asserts a violation of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3).[3] To establish a violation of section 1985(3), a plaintiff must prove: 1) a conspiracy of two or more persons; 2) to deprive any person of the equal protection of the laws or of equal privileges and immunities under the laws; 3) whereby an act in furtherance of the conspiracy; 4) either injures someone in their person or property, or deprives them of any right or privilege of a citizen of the United States. *United Brotherhood of Carpenters v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983).

Section 1985(3) creates no substantive rights of its own, but merely provides a remedy "when some otherwise defined *federal right*—to equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy in the manner defined by the section." *Great American Savings and Loan Assoc. v. Novotny*, 442 U.S. 366, 376, 99 S.Ct. 2345, 2351, 60 L.Ed.2d 957 (1979) (emphasis added). There must be a predicate violation of rights before the statute comes into play. While plaintiff argues that violations of state law can provide the predicate for 1985(3), the language quoted above has been interpreted as requiring a violation of federal law, whether federal statutory law or the Constitution. *See Holmes v. Fin-*

---

3. 42 U.S.C. § 1985(3) provides:
   If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws [and] if one or more persons engaged therein do, or cause to be done, any act in further-

ance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages....

*ney,* 631 F.2d 150, 154 (10th Cir.1980); *Thompson v. International Assoc. of Machinists,* 580 F.Supp. 662, 667 (D.D.C.1984); *see also Doski v. M. Goldseker Co.,* 539 F.2d 1326, 1333 (4th Cir.1976); *Cohen v. Illinois Inst. of Technology,* 524 F.2d 818, 828 (7th Cir.1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976). Not only must the predicate violation be of a federally created right, but "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). The applicability of 1985(3) to situations other than those motivated by racially discriminatory animus is questionable in light of the Supreme Court's statement in *Scott* that "it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause." 463 U.S. at 836, 103 S.Ct. at 3360. *See McLean v. International Harvester Co.,* 817 F.2d 1214, 1218 (5th Cir.1987). Prior to the *Scott* dicta quoted above, the Sixth Circuit applied section 1985(3) to discrimination against "discrete and insular minorities" identified through traditional equal protection analysis under the fourteenth amendment. *See Browder v. Tipton,* 630 F.2d 1149, 1151–53 (6th Cir.1980).

■ Because plaintiff has not alleged state action, she must point to a federal statute or constitutional provision that is violated by purely private conduct. *See Scott, supra,* 463 U.S. at 831, 103 S.Ct. at 3357 (§ 1985(3) does not create a cause of action for private violations of 1st or 14th amendments). She relies on 42 U.S.C. § 1981. Several courts have held that section 1981 may serve as the substantive basis for a cause of action under section 1985(3). *Chambers v. Omaha Girls Club,* 629 F.Supp. 925, 940 (D.Neb.1986); *Thompson, supra,* 580 F.Supp. at 667–68. Although 1981 happens to prohibit racial discrimination, this is not necessary to serve as a predicate for 1985(3) so long as a conspiracy motivated by racial animus resulted in the violation of some substantive federal right. The Supreme Court's ruling

in *Novotny* that the use of "rights created by Title VII" as the substantive predicate for a 1985(3) violation would contravene congressional intent by avoiding the strict procedural limitations of Title VII, does not preclude the use of 1981. Nor is 1981 superseded by Title VII. Title VII and 1981 " 'augment each other and are not mutually exclusive.' " *Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1203 (6th Cir. 1984) (quoting *Johnson v. Railway Express Agency,* 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975)). Moreover, the legislative history of Title VII indicates that 1981 was in no way affected by the passage of Title VII, which was designed to supplement, not supplant, existing employment discrimination laws. 749 F.2d at 1203–04.

■ Unfortunately, plaintiff's 1985(3) claim must fail for two independent reasons. First, as previously discussed, the incident of September 5, 1985 does not violate section 1981, which is the only potential predicate violation alleged by plaintiff. On these facts, absent the violation of a substantive federal right that prohibits purely private conduct there can be no cause of action under 42 U.S.C. § 1985(3). Second, plaintiff's 1985(3) claim is barred by the application of the intracorporate conspiracy doctrine. As the Sixth Circuit has recognized, the general rule, originating in the antitrust context and extending to civil rights claims, is that there can be no conspiracy between or among a corporation and its agents or employees. *Doherty v. American Motors Corp.,* 728 F.2d 334, 339 (6th Cir.1984) (extending the doctrine to in-house and outside counsel retained by corporation). There must be two or more persons or entities to have a conspiracy within the meaning of section 1985(3). In *Dombrowski v. Dowling,* 459 F.2d 190 (7th Cir.1972), the court wrote:

> if the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by [§ 1985(3)].

*Id.* at 196. The *Dombrowski* court contrasted actions by a single business entity

with actions by agents of the Ku Klux Klan on orders from the Grand Dragon. One exception to the intracorporate conspiracy doctrine has been where individuals are named as defendants and those defendants acted outside the scope of their employment for personal discriminatory reasons. *Garza v. City of Omaha*, 814 F.2d 553, 556 (8th Cir.1987); *Walker v. Woodward Governor Co.*, 631 F.Supp. 91, 93 (N.D.Ill.1986). The Klu Klux Klan certainly is not a legitimate business entity, and its concerted activities are, by definition, the result of personal discriminatory animus on the part of its members.

■ While several courts have held that the fact that a union is unincorporated takes it out of the *Dombrowski* conspiracy rule, *Thompson, supra*, 580 F.Supp. at 668; *Bailey v. Boilermakers*, 480 F.Supp. 274, 280 (N.D.W.Va.1979); *see also McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919, 940 (5th Cir.1977), these cases are poorly reasoned and draw a highly technical distinction. Under 29 U.S.C. § 185(b), a labor union is treated for all practical purposes as a corporation. It is bound by the acts of its agents; it can sue and be sued; and its members, like shareholders, are not personally liable for judgments rendered against the organization. Congress intended in section 185(b) to give union members "a protection analogous to that afforded shareholders in corporations against personal liability for corporate acts." *Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401, 426, 101 S.Ct. 1836, 1850, 68 L.Ed.2d 248 (1981) (Burger, C.J., & Rehnquist, J., dissenting). Thus under federal law a labor union possesses many of the characteristics unique to private corporations. *Highway & City Freight Drivers v. Gordon*, 576 F.2d 1285, 1289 (8th Cir.), *cert. denied*, 439 U.S. 1002, 99 S.Ct. 612, 58 L.Ed.2d 678 (1978). The logic of *Dombrowski* and *Doherty* applies equally to unions. Several union members acting on behalf of the union to harass a fellow employee in a racially discriminatory manner does not constitute a conspiracy within the meaning of section 1985(3), because "the challenged conduct is essentially a single act of discrimination by a single business entity." *Dombrowski*, 459 F.2d at 196.

When the eleven UAW Local 598 officials launched their brutal verbal assault on co-worker Yolanda Nieto, they were clearly acting on behalf of the union. The evidence indicates that the group of district committee persons, committee persons, shop committee persons and alternate committee persons went straight from a Local 598 union meeting to Yolanda Nieto's desk on September 5, 1983 to retaliate for her discipline of another union worker. The attack was obviously discussed and planned at the meeting, and executed on behalf of the union. Although on September 5, 1983 UAW Local 598 bore more resemblance to the Ku Klux Klan than it did to a legitimate business entity representing the interests of otherwise powerless workers, its actions are shielded from liability by the intra-business entity immunity doctrine. Precisely because Local 598 sanctioned this invidious racial assault, the individuals are also immune from liability under 1985(3).

### Conclusion

For the reasons set forth above, and because there is no genuine issue of material fact, the individual defendants' and the union's motions for summary judgment will be granted with respect to the claims under 42 U.S.C. §§ 1981 and 1985(3). The pendent state claims will be dismissed without prejudice pursuant to *United Mineworkers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).