LAC du FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, Michael Allen, Wa–swa–gon Treaty Association, Thomas Maulson, Robert Martin, Nick Hockings, Gilbert Chapman, Plaintiffs,

v.

STOP TREATY ABUSE–WISCONSIN, INC., Dean Crist, Al Soik, Elaine Soik, Wayne Pieper, Tommy Handrick, Glen Handrick, Howard Caputo, Charles Ahlborn, Mike Ahlborn, Jack Lanta, Rose Lanta, Lois Pavlovich, Charles Gilman, Brian Crist, Patrick Long, David Worthen, James Williquette, David Enblom, Wayne Wirsing, and Unknown John Does and Jane Roes, Defendants.

No. 91–C–117–C.

United States District Court,
W.D. Wisconsin.

March 15, 1991.

Brian L. Pierson and Irvin B. Charne, Charne, Clancy & Taitelman S.C., Milwaukee, Wis., for Lac du Flambeau Band, Michael Allen, Wa–swa–gon Treaty Ass'n, Thomas Maulson, Robert Martin, Nick Hockings and Gilbert Chapman.

Richard E. Sommer, Sommer, Olk & Schroder, Rhinelander, Wis., for Stop Treaty Abuse–Wisconsin, Inc., Dean Crist, Wayne Pieper, Tommy Handrick, Glen Handrick, Howard Caputo, Charles Ahlborn, Jack Lanta, Rose Lanta, Lois Pavlovich, Charles Gilman, Brian Crist, Patrick Long, David Worthen and Mike Ahlborn.

Ted Waskowski, Madison, Wis., for Al Soik and Elaine Soik.

Charles H. Bohl, Frisch Dudek, Ltd., Milwaukee, Wis., for James Williquette, David Enblom and Wayne Wirsing.

## OPINION AND ORDER

CRABB, Chief Judge.

Plaintiffs are seeking a preliminary injunction against defendants to prevent them from interfering with plaintiffs' exercise of their treaty-guaranteed right to spear walleye. A hearing on the motion was held on March 7, 1991.

Plaintiffs contend that defendants Enblom, Wirsing and Williquette, the sheriffs of Ashland, Price and Vilas Counties, have conspired with the other defendants to deny plaintiffs their treaty-guaranteed rights, and that the remaining defendants have waged a racially-motivated campaign of violence and intimidation against plaintiffs in an effort to make it difficult or impossible for them to spear fish. Plaintiffs seek an order of this court prohibiting the private defendants (1) from assaulting or battering any member of the Lac du Flambeau band or any family member or friend of any member of the band at any landing or on any lake or en route to or from any lake within the ceded territory; (2) from approaching within 250 feet of any member of the Lac du Flambeau band or any relative or friend of any member at any boat landing; (3) from approaching within 250 feet of any landing area, except to launch or land boats; (4) from intentionally creating wakes to interfere with any spearer; (5) from intentionally blocking plaintiffs' ingress or egress at any boat landing; (6) on any waterway, from approaching within 500 feet of any boat carrying any member of the Lac du Flambeau band; (7) from planting decoys or otherwise sabotaging plaintiffs' exercise of their treaty rights; and (8) from intentionally interfering by any means with any Lac du Flambeau member's exercise of treaty rights. Also, plaintiffs seek an order requiring the defendant sheriffs to enforce the injunction entered against the private defendants; provide protected areas at boat landings for members of the Lac du Flambeau band, their families and friends, giving them unrestricted access to their spearing boats and gear; reserve an adequate number of protected parking spaces at boat landing parking lots for members of the Lac du Flambeau band; assure convenient and unimpeded access to landings and to waterways to members of the Lac du Flambeau band, including, where necessary, giving priority to tribal members over protesters in the launching and landing of boats; and confine protesters to an area at least 250 feet from the landing.

For the purpose only of deciding this motion, I make the following findings of fact from the evidence adduced at the hearing and from the parties' affidavits.

## FACTS

The Lake Superior Chippewa Indians are a tribe recognized by the United States government. In 1837 and 1842, the tribe entered into treaties with the United States under which they gave up hundreds of thousands of acres of land in what is now Wisconsin but reserved their right to hunt, fish and gather food in the territory they had ceded. Pursuant to the treaties, members of the plaintiff Lac du Flambeau band have a treaty-guaranteed right to fish off the reservation.

Plaintiff Michael Allen is chairman of the Lac du Flambeau band and as such is its highest elected official.

Wa-swa-gon Treaty Association is an unincorporated association of members of the Lac du Flambeau band and others. It supports the exercise of off-reservation treaty-recognized fishing rights.

Plaintiffs Thomas Maulson, Robert Martin, Nick Hockings and Gilbert Chapman are Wisconsin citizens and members of the Lac du Flambeau band residing on the Lac du Flambeau reservation.

Defendant James Williquette is a resident of Wisconsin and the sheriff of Vilas County. Defendant David Enblom is a resident of Wisconsin and the sheriff of Ashland County. Defendant Wayne Wirsing is

a resident of Wisconsin and the sheriff of Price County.

The remaining defendants I will refer to as the "private defendants." They include defendant Stop Treaty Abuse–Wisconsin, Inc. (STA), which is a for-profit corporation organized under the laws of the State of Wisconsin with its principal place of business in Woodruff, Wisconsin, and defendants Dean Crist, Al Soik, Elaine Soik, Wayne Pieper, Tommy Handrick, Glen Handrick, Howard Caputo, Charles Ahlborn, Mike Ahlborn, Jack Lanta, Rose Lanta, Lois Pavlovich, Charles Gilman, Brian Crist, Patrick Long and David Worthen, all of whom are residents of Wisconsin and agents of STA.

The walleye spearing season begins in April or May, shortly after the ice breaks up and the lakes open and the fish come up out of the depths of the lake to spawn in the shallow water near the shore. The season lasts about fifteen days and is open only to members of the Lake Superior Chippewa. State law prohibits open water spearing by non-Indians.

Spearers fish after dark when the fish have moved onto the spawning beds. They spear from a standing position in the front of a slowly moving shallow draft boat, using a ten foot long metal spear. Light is provided by a large lamp mounted on the spearer's headgear.

Spearing is an important part of the cultural and religious heritage of the Chippewa. The fish that plaintiffs and other tribal spearers take are an important source of food for the spearers and for others in the tribe who are needy and unable to fish.

Plaintiffs Maulson, Martin, Hockings and Chapman have been spearers since childhood and have been exercising their right to spear off the reservation since the courts confirmed that the Chippewa retained this right. When they and other tribal members began exercising their off-reservation fishing rights, they met with little opposition. Beginning in 1986 and 1987, however, more and more people began to demonstrate against spearing at the boat landings on lakes where spearing was taking place, and local police and sheriffs found it difficult to control the demonstrations.

At the request of local law enforcement officers, work was begun on a plan to provide assistance to the counties in keeping peace during the spearing season. Local police chiefs and county sheriffs' officials from about eighteen northern Wisconsin counties formed a working group with representatives of the Governor's Office, the Wisconsin State Patrol, the Department of Military Affairs, the Division of Criminal Investigation of the Department of Justice, the Department of Natural Resources and the Division of Emergency Government for the State of Wisconsin. The working group did not include any representatives of the Chippewa.

Under the plan developed by the working group, primary responsibility for peace keeping and law enforcement at the boat landings rests with the sheriff of each county. Department of Natural Resources conservation wardens have exclusive jurisdiction over the lakes and on-water law enforcement. The sheriff and the wardens are assisted by the mutual aid force, which includes police officers and sheriffs' deputies from up to eighteen different counties whose vacated positions are staffed by state patrol officers. Department of Criminal Investigation officials observe the boat landings and gather information for use by other law enforcement officers. The Department of Military Affairs provides housing, food, generators, lights and other supplies and support. The Division of Emergency Government provides general coordination of all of the agencies and acts as a resource agency and clearinghouse for intelligence-gathering and dissemination of information and recommendations to the Governor and the Wisconsin Department of Administration. A centralized communication or field command post is staffed for the spearing season by representatives of each of the law enforcement agencies.

Under the plan, the tribes advise the Department of Natural Resources representative at the command post by noon each day of the lakes they intend to spear that night. The command post then coor-

dinates the dispersion of law enforcement personnel and equipment to the boat landings at the designated lakes.

At each landing, officers set up lighting and mark off with snow fences and barrier tapes areas around the landing for boat launching, enforcement personnel, official vehicle parking and the press. All spectators, Indian or non-Indian, must remain behind the fenced-off areas while boaters and spearers use the landing. Representatives of the Great Lakes Indian Fish and Wildlife Commission are permitted in the protected area when they are performing official duties, such as weighing and measuring the walleye catch. Department of Natural Resources wardens are permitted in the protected area at all times, although they are primarily in boats out on the water.

The Bureau of Training and Standards of the Wisconsin Department of Justice has developed and instituted training programs for law enforcement personnel involved in handling spearing activities, which are offered each spring at the Fox Valley Technical Institute and are open to all law enforcement personnel. Some of the instructors are used as consultants and deputy sheriffs at the boat landings, where they monitor the crowds and provide continuing training to the officers.

There have been no serious physical injuries or deaths at any of the boat landings during spearing seasons and only a small number of minor physical injuries.

The law enforcement personnel are taught to serve as a neutral peacekeeping force and to avoid any appearance of partiality. They try to ensure that all persons who have boats to launch are allowed equal access to the boat landings. It is part of the law enforcement plan to arrest and prosecute those who violate the law; however, officers do not arrest everyone who engages in misconduct. The officers use their discretion to determine the appropriate level of tolerance they should exercise, depending on the volatility of the crowd, the physical characteristics of the particular boat landing and the number of law enforcement officials present. For in-

stance, they rarely take action against persons expressing verbal insults, blowing whistles or engaging in minor pushing and shoving because the risk of harm to the target is less than the risk of inflaming the tensions of the crowd.

Even with actions that warrant arrest, it is not always possible for law enforcement officers to seize the perpetrator. The dark, often wooded landings make it hard to identify and pursue suspects.

Despite the presence of large numbers of law enforcement officials, members of defendant STA have subjected plaintiffs, other tribal spearers and the families of spearers to stone throwing, threats of harm, racial and sexual insults, minor batteries, and damage to their vehicles. It is the intent of STA and the other private defendants to minimize the number of fish that plaintiffs can take during spawning season, by blocking the landings, creating wakes, planting concrete walleye decoys, and gathering large numbers of persons at the boat landings to harass the spearers and their families and friends with threats, taunts, racial insults, obscene comments, air raid sirens, whistles, and derogatory songs and chants.

STA members have endangered the lives of spearers by intentionally creating wakes to make it more difficult for spearers to fish. High wakes interfere with a spearer's ability to see and to spear fish and they create the risk that the spearer will fall from the boat into the recently thawed water.

On May 2, 1989, on Plum Lake, defendant Dean Crist drove a boat directly toward a spearing boat and began to run his boat back and forth parallel to shore about 100 yards from the spearing boat, traveling at half throttle and creating a large wake. When wardens attempted to stop the boat, it sped away, almost hitting another warden boat. Earlier the four individuals in the boat had been shining their spotlight into the eyes of spearing Indians. On Plum Lake in 1990, a high wake caused Charlotte Hockings to fall while she was riding in the boat from which her husband was spearing. On Minocqua Lake in April 1990,

while David Peterson, Lucas Peterson and plaintiff Robert Martin were spearing, their boat was rammed by a boat operated by defendant Brian Crist. Lucas Peterson lost his balance and almost fell into the water. On Sand Lake in April 1990, Department of Natural Resources Warden Gary Scovel observed defendant Dean Crist operate his boat deliberately and continuously in a manner designed to create a large wake, impeding the spearing efforts of the Chippewa. On April 19, 1990, at Big Arbor Vitae Lake, Scovel observed defendants Dean Crist, Patrick Long and Brian Crist set up deliberatively a pattern of hazardous wakes that impeded the Chippewa's spearing efforts. On April 21, 1990, on Star Lake, Scovel observed defendants Dean and Brian Crist deliberately obstruct three spearing boats as they tried to navigate through a channel and he observed defendant Charles Gilman create a hazardous wake that hit a spearing boat hard enough to knock one of the occupants off his feet and almost out of the boat. On April 24, 1990 on Plum Lake, Scovel observed six boats operated by protesters, including defendant Dean Crist, follow three spearing boats and create hazardous wakes around them. The wakes prevented plaintiff Hockings from spearing more than four fish. When Scovel attempted to reason with defendant Dean Crist, Crist's passenger, defendant Patrick Long, told Scovel, "Gary, we're just trying to stop the Indians from spearing all of those fish." Although Scovel threatened to issue a citation against Crist, Crist continued to impede Hockings's efforts to spear.

Protesters have dragged heavy objects through the spawning beds to stir up the lake bottom and make it difficult to see fish. Also they have played "leapfrog" with spearing boats, blocking the path of a boat by pretending to fish by hook-and-line so that the spearer has to go around the protester boat, and then moving quickly in front of the spearing boat again. Another protest tactic is shining boat lights into the faces of spearers so that they cannot see to fish or into the eyes of the boat driver so that he cannot guide the boat. At some boat landings STA members launch boats and remain close to the landing so that they can verbally harass plaintiffs and other spearers and impede their progress as they try to move their boats out to the spawning areas.

On posters and in verbal taunts, STA members and other protesters have expressed racial insults to plaintiffs, their family members and their friends, such as "Timber nigger"; "Save a walleye; spear a squaw"; "Spear a pregnant squaw; save two walleye"; "Custer had the right idea"; "Scalp 'em"; "Tom Maulson is a fucking Jew; he needs a Hitler"; "You're a conquered nation; go home to the reservation"; "wagonburners" and "diarrhea face." Defendant David Worthen has a poster in his bar that reads, "Help Wanted: Small Indians for mud flaps. Must be willing to travel."

Spearers have been threatened with violence. Protesters have told Tom Maulson, "We'll be waiting for you; you'll never get back to Flambeau"; "We know where your wife is"; "Do you think you'll see your wife again?"; "This is your night tonight." A common STA song at the landings is "Hang down your head, Tom Maulson, poor boy, you're going to die." Protesters have made similar threats to plaintiffs Robert Martin, Nick Hockings and Gilbert Chapman. STA members have told spearers, "We hope you brought your body bags," and have chanted, "Drown them, drown them."

Families and friends of spearers have been threatened with violence and assaulted and battered. During the 1990 spearing season, protesters began the practice of blowing whistles loudly, often directly in the ears of spearing supporters. Protesters have encircled spearing supporters, causing them great anxiety. Also, protesters have hit and shoved spearers' family members and friends and yelled racial and sexual insults at them. One seventeen-year-old boy was told by a protester, "I'm going to remember you. I'm going to get you, you motherfucker."

The activities of the private defendants and others have caused spearers concern for their physical safety and have deterred

them from bringing their wives, children and young nieces and nephews with them when they spear. Lac du Flambeau band member David Peterson avoids spearing on lakes where he expects defendant Brian Crist to be present. He estimates that this has caused him a loss of about 200 fish that he could have speared had he been speared in lakes where Crist was present.

Defendant Dean Crist is STA's spokesman. He has stated that STA will do its best to "minimize the unfair exploitation of Wisconsin's resources by the Chippewas" and stop the walleye harvest, if possible. In 1989 he stated that it was STA's "main objective to get as many boaters as possible driving back and forth on the lakes making wakes." He believes that filling the back live wells and driving at half throttle "is an effective way to minimize the spearing harvest." He has personally created wakes on the water for the purpose of hampering spearers. During the 1990 spearing season he was on the water almost every night making wakes. Other members of STA have promoted the idea of boating back and forth at half throttle during spearfishing to send large wakes toward the shorelines where the Chippewa were trying to stand up in their boats to see spawning walleyes in the shallows.

To encourage the planting of walleye decoys, which are intended not just to divert the spearers from live fish but also to damage their spears, STA has sponsored a contest for concrete walleye decoys suitable for mass production.

In the spring of 1990, the state legislature enacted Wis.Stat. § 29.223, effective April 13, 1990, which prohibits interfering or attempting to interfere with lawful hunting, fishing or trapping with the intent to prevent the taking of a wild animal. Section 29.223(4) authorizes persons who have been or expect reasonably to be affected adversely by activity prohibited by the statute to bring an action in state court for an injunction or damages or both. In addition, Wis.Stat. § 29.99 provides for forfeitures for violations of the provisions of § 29.223 of not more than $500 for interfering with a hunter, fisher or trapper and not more than $1000 for failing knowingly to obey the order of a warden or other law enforcement officer to cease the prohibited conduct.

Wis.Stat. § 813.125 authorizes the granting of a temporary restraining order or permanent injunction to a person who shows probable cause to believe that he or she has been struck, shoved, kicked or otherwise subjected to physical contact or threat of physical conduct by another or has been subjected to a course of conduct or repeated acts that harass or intimidate with no legitimate purpose. Wis.Stat. § 30.68(2) prohibits the careless, negligent or reckless operation of any boat in a manner that endangers the life, property or person of another; a violator of this statute may be imprisoned for up to six months and fined $200. Section 30.68(4) prohibits operating a motorboat so as to approach or pass another boat in such a manner as to create a hazardous wake or wash and makes the operator who does so responsible for any damage caused by the wake. The penalty for the first violation of subsection (4) is a $50 forfeiture; the penalty for the second violation is a $100 forfeiture.

In 1989 and 1990 the Department of Natural Resources assigned one warden boat to each spearing boat to provide protection on the lake. In 1990, the wardens informed on-water spectators and protesters that driving a boat between spearing boats and warden boats would constitute a violation of the new anti-harassment law. The wardens' policy was to enforce the statute progressively: for the first violation, a citation was prepared later and delivered to the violator; for the second violation, a citation was issued immediately; and for the third violation, the violator was arrested and taken into custody. For the 1991 season, the wardens intend to make in-custody arrests for any violation of the law.

Despite the presence of warden boats, flotillas of boats driven by protesters clogged the launching areas to prevent spearers from launching their boats at North Twin and Catfish Lakes in 1989 and 1990, at Squirrel, Plum, and Big Arbor Vitae Lakes in 1989, and at Tomahawk and

Minocqua Lakes in 1990. At Big St. Germain Lake in 1990, defendant Dean Crist led a protest across the barrier into the launching area that was intended to prevent spearers from using the area.

During the 1989 and 1990 spearing seasons, plaintiff Tom Maulson was able to spear on every night for which he held a permit, although there were some nights on which he had to wait to launch his boat. His longest wait was 30 to 45 minutes.

Following the 1989 spearing season, Waswa-gon sent law enforcement agencies a letter of thanks for the excellent job they did "under extremely adverse conditions" and invited them to attend a Feast and End of Spring Harvest Ceremony.

The number of arrests made during the 1990 spearing season decreased considerably from the number of arrests made in 1989. Between April 23, 1989 and May 6, 1989, 208 arrests were made; between April 10 and May 4, 1990, 76 arrests were made. Arrests were made for criminal damage to property, disorderly conduct, obstructing an officer, resisting arrest, battery, trespass and carrying a concealed weapon. In 1989, citations were issued for creating hazardous wakes, shining lights in spearers' eyes and for swamping a boat.

Based on the decline in arrests and on post-season analyses by warden field supervisors and the new policy of physical arrest and removal of all violators of the anti-harassment act, the Department of Natural Resources plans to reduce the number of wardens on the lakes by 25% in 1991. The department's contingency plan calls for increasing the staffing if actual problems require it.

Rolland Lee, assistant chief conservation warden for the Department of Natural Resources, believes that in the dark of the night, with boats moving at different angles, it might be difficult to determine whether boats are closer than 500 feet to spearers.

Law enforcement officials have refused requests to provide separate, protected areas for the families and friends of spearers or for the vehicles of spearers. Alan Shanks, Director of the Bureau of Field Services and Disaster Resources for the Division of Emergency Government, and William Woger, consultant to the working group and one of the persons responsible for developing the law enforcement training programs for the spearing season, believe that separating Chippewa families, friends and supporters into one area would make them more vulnerable to stone throwing or more serious attacks because it would give protesters a focus for their hostility. Also, Shanks and Woger believe that it would not be possible to provide the Chippewa with special, protected parking for their vehicles at the landings or to keep protesters at least 250 feet from the landings. Many of the landings have limited cleared areas around them that would make it impossible to provide protected parking or a buffer zone for protesters. What protected parking can be provided is reserved for law enforcement vehicles which are needed for emergency transport, for storage of law enforcement gear, and for transportation of equipment. It is Shanks's and Woger's opinion that violence is better controlled when protesters are allowed to assemble at the boat landings, where they are under the constant observation of large groups of well-equipped law enforcement personnel. Dispersing the crowds in a larger area where there is tree cover and less lighting makes it more difficult to monitor their actions.

On one occasion in 1990 at Star Lake, defendant Williquette asked Dean Crist for help in intervening with some of his supporters who had climbed to the top of an outhouse where they were confronting some Indians. Sheriff Williquette believed that Crist would be able to persuade the non-Indians to come down before a fight broke out and serious injury resulted.

On at least one occasion Dean Crist provided Sheriff Williquette with advance notice that he and his group planned to cross police lines as a spearing protest. On one of these occasions, Crist's conversation with Williquette was recorded.

Dean Crist has been arrested on at least six occasions during the spearing seasons in 1989 and 1990: on April 25, 1990, for

failure to obey a warden and harassment of persons engaged in lawful fishing activity; for the same violations later on the same day; on April 27, 1990, for obstructing an officer and disorderly conduct; on April 26, 1989, for obstructing an officer and disorderly conduct; on April 30, 1989, for disorderly conduct; and on May 2, 1989, for harassment, reckless operation of a boat and obstructing or resisting a warden.

Citations were issued for ordinance violations (refusing orders from a law enforcement officer) on April 26, 1989 against defendants Al Soik, Tommy Handrick, Charles Ahlborn, Mike Ahlborn, Lois Pavlovich and David Worthen. A citation for creating a wake was issued against defendant Worthen on April 28, 1989. Defendants Al Soik, Elaine Soik, Wayne Pieper, Tommy Handrick, Howard Caputo, Mike Ahlborn, Charles Gilman, Patrick Long and David Worthen were arrested on May 5, 1989 for obstruction. A complaint was issued on May 12, 1989 against defendant Patrick Long for unlawfully resisting a conservation warden. Complaints for disorderly conduct were issued against defendants Al Soik, Charles Ahlborn, Mike Ahlborn, Brian Crist and Patrick Long on May 4, 1990.

In 1989 and in 1990 STA members crossed into a protected area at a boat landing as a symbolic protest against spearing. On both occasions they were arrested and removed from the landing.

## OPINION

The prerequisites of a preliminary injunction are well-established. The movant must show (1) a reasonable likelihood of success on the merits; (2) the lack of any adequate remedy at law; (3) that irreparable harm will ensue if the injunction does not issue; (4) that the harm to the movant if the injunction does not issue outweighs the harm to the opponent if it does; and (5) that the public interest will not be harmed by the injunction's issuance. *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380 (7th Cir.1984).

### A. The Defendant Sheriffs

At the outset I will take up the assertion of defendants Enblom, Wirsing and Williquette that plaintiffs have failed to adduce any evidence that would merit the entry of a preliminary injunction against them. They contend that plaintiffs' claims fail the first requirement of an injunction because they have not shown any likelihood that they could succeed on the merits on their claim that the defendant sheriffs violated plaintiffs' rights personally or that they conspired with others to do so. I agree.

■ Plaintiffs adduced evidence with respect to defendant Williquette that on two occasions defendant Dean Crist advised him in advance of STA's plans to engage in a symbolic entry into the protected area of a boat landing as a form of protest against the spearing, and that on one occasion, Williquette asked Crist for assistance in clearing young protesters and Indians from the roof of an outhouse at a landing. Considered independently or together, these two acts do not show that Williquette conspired with Crist or anyone else to interfere with plaintiffs' rights. The protesters were arrested on both occasions that they crossed the protected area of the landing.

■ As to the sheriffs in general there is a dearth of evidence. Plaintiffs have alleged only that the sheriffs refused to provide segregated and protected areas for spearers, their families and friends and their vehicles, and refused to arrest protesters they knew were committing acts of violence or harassment. The evidence shows that the refusal to provide segregated areas for standing or parking conformed to the law enforcement plan developed by the law enforcement working group. Whatever the merit or lack of merit of that plan, the sheriffs' compliance with it cannot be said to be evidence of conspiracy against the plaintiffs. Neither can it be said to be evidence of any personal violation of plaintiffs' rights by the sheriffs, in view of the expert opinion that providing segregated areas for vehicles is not feasible and that providing such areas for the friends and families of spearers would put these people at greater risk. Plaintiffs adduced no evi-

dence of any occasion on which any of the defendant sheriffs refused to arrest a protester who was threatening or causing actual harm to plaintiffs, their families or friends.

Because plaintiffs have not shown *any* likelihood that they could prevail ultimately on their claims against the defendant sheriffs, I will deny their motion for a preliminary injunction against these defendants, and consider only plaintiffs' motion as it relates to the private defendants.

### B. The Private Defendants

#### 1. Likelihood of success on the merits

Plaintiffs are suing under 42 U.S.C. §§ 1982, 1983, 1985(3), 1986 and Wis.Stat. §§ 844.01 (interference with real property), 29.223 (interference with hunting, fishing and trapping), and 813.125 (harassment). I will consider their claims under each of the federal statutes as they relate to the likelihood that plaintiffs will prevail on the merits in this action.

#### a. Section 1982

42 U.S.C. § 1982 guarantees all citizens of the United States the same rights enjoyed by white citizens to "inherit, purchase, lease, sell, hold and convey real and personal property," and forbids both official and private interference with such rights. Defendants contend that this statute provides no protection for plaintiffs for two reasons. First, plaintiffs are not "subjected to intentional discrimination solely because of their ancestry or ethnic characteristics," which is a necessary element of recovery under § 1982. *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987). Rather, plaintiffs are the target of the private defendants' actions solely because of the activity in which they engage. Second, the usufructuary rights the plaintiffs are exercising are not property rights within the meaning of § 1982.

■ There is some surface plausibility to the private defendants' contention that their efforts to stop plaintiffs' spearing are not racially motivated and that the private defendants would be attempting to stop any activity that threatened to harm their own fishing opportunities. Closer reflection reveals the frailty of this contention. The private defendants have adduced no evidence that they have ever engaged in an organized protest against overfishing by hook-and-line, over real estate developments that threaten to impair walleye habitat, or over any other kind of activity that might affect fishing in the ceded territory. Their statements resonate with the echo of an older refrain: "I have nothing against blacks [or Asians or hispanics or others] as long as they don't exercise their rights to live in my neighborhood [or go to school with my children or compete for my job]." The Court of Appeals for the Second Circuit pointed out the flaw in a similar argument raised in *New York State NOW v. Terry,* 886 F.2d 1339, 1359 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990), involving anti-abortion protesters sued under 42 U.S.C. § 1985(3):

> Defendants' argument that their actions are directed against an activity, or only a "subgroup" of women rather than women in general, is insufficient to escape the scope of § 1985(3). In most cases of invidious discrimination, violations of constitutional rights occur only in response to the attempts of certain members of a class to *do* something that the perpetrators found objectionable.... It is sophistry for defendants to claim a lack of class-based animus because their actions are directed only against those members of a class who choose to exercise particular rights but not against class members whose actions do not offend them. [Citation omitted].

The private defendants' argument ignores the posters labeling spearers as "timberniggers" or "mud flaps" and the taunts of "Custer had the right idea" or "Scalp 'em" or "Go home to the reservation; you're a conquered nation." The private defendants' own statements leave no doubt that much of the anti-spearing campaign is driven by racial hostility toward Indians.

■ To support their assertion that plaintiffs' usufructuary right is not "property" within the meaning of § 1982, the private defendants cite nothing other than a portion of the Black's Law Dictionary definition of "usufruct":

> In the civil law. The right of enjoying a thing, the property of which is vested in another and to draw from the same the profit utility and advantage which it may produce, provided it be without altering the substance of the thing.

Black's Law Dictionary, 1712 (4th ed. 1957). In the definition that appears in the sixth edition (1990), the introductory phrase reads as follows: "In the civil law, a *real right* of limited duration on the property of another." (Emphasis added.)

The dictionary definition of usufruct does not answer the question whether a right such as plaintiffs' right to spear would be treated as property under 42 U.S.C. § 1982. However, the opinions of the United States Supreme Court indicate that plaintiffs' rights are well within the expansive protection offered by the statute. *See, e.g., Memphis v. Greene*, 451 U.S. 100, 120, 101 S.Ct. 1584, 1597, 67 L.Ed.2d 769 (1981): "To effectuate the remedial purposes of [section 1982], the Court has broadly construed [its] language to protect not merely the enforceability of property interest acquired by black citizens but also their right to acquire and use property on an equal basis with white citizens." To that end, the Court has held that § 1982 encompasses "every racially motivated refusal to sell or rent," *Jones v. Alfred H. Mayer Co.* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), an assignable membership share in recreational facilities, *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), and a preference to purchase a nontransferable swim club membership, *Tillman v. Wheaton–Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973). *See also Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333, 1339 (2d Cir.1974): "It is reasonable to characterize the freedom of blacks to go and come as guests of a swim club member as sufficiently pertaining to a condition of property to be a right capable of being held under § 1982.... Whether these rights are denominated licenses, easements or usufructs, the guest has an interest in his guest status which the law may protect from certain invasions." (Citations omitted.)

It is not even necessary to read § 1982 as broadly as the courts did in *Olzman* or *Tillman* to find that it covers plaintiffs' usufructuary rights. Wisconsin's definition of real property includes interests such as plaintiffs', which have been characterized by the court of appeals as similar to a profit a prendre. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 352 (7th Cir. 1983). Wis.Stat. § 840.01 defines property as

> estates in, powers ... over, and all present and future rights to, title to, or interests in real property, including without limitation by enumeration, security interests and liens on land, easements, profits, rights of appointees under land, rights under covenants running with the land, powers of termination and homestead rights; the interest may be such as was formerly designated legal or equitable; the interest may be surface, subsurface, suprasurface, riparian or littoral; but "interest" does not include interests held only as a member of the public nor does it include licenses.

Wis.Stat. § 840.01. Whatever Black's Law Dictionary says about a "usufruct," it is difficult to argue that Wisconsin would not recognize a usufructuary interest as a property right under § 840.01.

I conclude that to the extent the private defendants have prevented plaintiffs from exercising their fishing rights, they have violated the right to use their property that is guaranteed plaintiffs under 42 U.S.C. § 1982.

**b. Section 1983**

■ 42 U.S.C. § 1983 requires a showing of "state action." The statute does not reach the actions of private parties, however improper they may be. Thus, plaintiffs' § 1983 claim against the private de-

fendants falls with the finding that there is no evidence of a conspiracy between the private defendants and the defendant sheriffs to violate the plaintiffs' rights.

c. Section 1985(3)

■ 42 U.S.C. § 1985(3) makes it illegal for persons to conspire for the purpose of depriving any person or class of persons of the equal protection of the laws. A plaintiff must show that one or more of the conspirators did or caused to be done an act in furtherance of the conspiracy that injured another or deprived him or her of having and exercising any right or privilege of a citizen of the United States. *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971).

■ Unlike § 1983, § 1985(3) does not require the involvement of state actors. Therefore, it would seem to apply to the acts of the private defendants. They contend that it does not because all of their actions were taken in furtherance of the corporate goals of STA while they were acting as agents for STA.

As a general rule in this circuit, the conspiracy requirement of § 1985(3) is "not satisfied by proof that a discriminatory business decision reflects the collective judgment of two or more executives of the same firm ... if the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by this statute." *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir.1972). The point is that a corporation is able to act only through its employees and agents; to hold that it can conspire with its own agents is to say that it is conspiring with itself.

A number of courts have expressed dissatisfaction with applying *Dombrowski's* rule in situations in which numerous unconstitutional acts are alleged to have been committed by different corporate officers or agents. In *Dombrowski* itself, then Judge Stevens expressed a caveat: "We do not suggest that an agent's action within the scope of his authority will always avoid a conspiracy finding. Agents of the Klan certainly could not carry out acts of violence with impunity simply because they were acting under orders from the Grand Dragon." 459 F.2d at 196.

In *Volk v. Coler*, 845 F.2d 1422, 1435 (7th Cir.1988), the court held that *Dombrowski* did not require a directed verdict in favor of a corporate defendant when the plaintiff had shown many different acts undertaken by several defendants. *See also Craft v. Board of Trustees*, 516 F.Supp. 1317, 1324 (N.D.Ill.1981) (allegations of a series of discriminatory acts stated claim of conspiracy under § 1985(3) against university's board of trustees and its employees); *An–Ti Chai v. Michigan Technological University*, 493 F.Supp. 1137, 1166–67 (W.D.Mich.1980) (different discriminatory acts committed by two or more corporate officers acting by agreement constituted violation of § 1985(3)).

■ Also, as Judge Stevens's dictum makes clear, conspirators cannot avoid the reach of § 1985(3) simply by forming a corporation through which they commit discriminatory acts. The creation of a principal for whom they are agents does not protect conspirators acting out of racially discriminatory motives. *Cole v. University of Hartford*, 391 F.Supp. 888, 893 (D.Conn.1975). *See also Novotny v. Great American Federal Sav. & Loan Ass'n*, 584 F.2d 1235, 1258 (3d Cir.1978), *vacated on other grounds*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) (incorporation did not immunize employees from liability under § 1985(3) where agents of corporation made concerted effort to deprive plaintiff of her right to equal employment).

■ It is unlikely that the private defendants will be able to establish that their roles as agents of a corporation immunize them from liability. Plaintiffs have shown the involvement of various persons interfering repeatedly with plaintiffs' spearing activities as agents of a corporation created for the purpose of restraining plaintiffs' ability to exercise their treaty rights to hunt, fish and gather in the ceded territory.

Such a showing makes the intracorporate limitation on the scope of § 1985(3) inapplicable.

■■■ The private defendants argue that even if they can be found to be conspirators under this section, they cannot be said to have conspired to deprive any class of persons of the equal protection of the laws, because the rights that the Chippewa are exercising are not rights that non-Chippewa can exercise. This argument summarizes the misconception that fuels the private defendants' campaign against the Chippewa spearers.

The rights the Chippewa possess are property rights for which they contracted with the United States government over 150 years ago. The state's protection of those rights is no different from its protection of the property rights of non-Indians. Just as the law protects non-Indians' use and enjoyment of property they have bargained for, whether it be real estate, an automobile, a contractually-guaranteed job or admission to a private club, the law protects the Chippewa's use and enjoyment of the property they bargained for.

Plaintiffs have a reasonable likelihood of succeeding on the merits of their claim that the private defendants conspired to deny plaintiffs the equal protection of the law or equal privileges and immunities under the law, within the meaning of § 1985(3).

#### d. Section 1986

■■■ 42 U.S.C. § 1986 authorizes an action against any person who knows that a conspiracy actionable under § 1985 is about to be committed, has power to prevent or aid in preventing the conspiratorial wrongs, and fails or neglects to act. A finding of conspiracy under § 1985 is a necessary prerequisite to a finding of liability under § 1986.

■■■ Plaintiffs contend that defendants Dean Crist and STA are liable to them under this statute. In light of the conclusion that plaintiffs have a reasonable likelihood of succeeding in showing a violation of § 1985(3) and the facts that tend to show Crist's leadership role and influence

in STA, I conclude that plaintiffs have a measurable chance of succeeding on the merits of this claim as well.

#### e. State laws

Because I have found that plaintiffs have a reasonable likelihood of succeeding on the merits of their claims under 42 U.S.C. §§ 1982, 1985(3) and 1986, it is not necessary to determine at this time whether plaintiffs would be likely to succeed on their state law claims as well.

#### 2. Lack of adequate remedy at law

■■■ As an additional prerequisite to obtaining a preliminary injunction, plaintiffs must show that their remedy at law is inadequate. *Kowalski v. Chicago Tribune Co.*, 854 F.2d 168, 171 (7th Cir.1988). Inadequate monetary damages means that a damages award will be seriously deficient as a remedy for the harm suffered. *Roland Mach.*, 749 F.2d at 386.

■■■ Plaintiffs might be able to recover monetary damages sufficient to compensate them for any actual economic loss of fish resulting from the challenged activities. However, plaintiffs have alleged that they have suffered personal assaults, batteries and harassment and interference with an important cultural and religious practice. These injuries cannot be remedied by monetary damages. Only an injunction will ensure plaintiffs' right to spear unimpeded by the illegal actions of the private defendants.

Defendants argue that an adequate remedy at law exists in the state laws which provide penalties for assault, battery and creation of hazardous wakes. However, enforcement of existing laws does not obviate the necessity for injunctive relief where the plaintiffs continue to suffer interference with the exercise of their rights. *See National Organization of Women v. Operation Rescue*, 726 F.Supp. 1483, 1496 (E.D.Va.1989), *aff'd*, 914 F.2d 582 (4th Cir. 1990) (police enforcement of law against anti-abortion activists not adequate remedy where police unable to ensure access to clinics). Despite the extensive law enforcement efforts of the Department of Natural

Resources and other law enforcement officials, the private defendants have continued to engage in conduct prohibited by law. Protesting activities declined in 1990, but they did not cease. Dean Crist's six arrests over the past two seasons have not deterred him from such conduct. Arrests and citations have not deterred other STA members. I conclude that neither the existence of state laws nor conscientious attempts to enforce those laws against the private defendants provides plaintiffs with an adequate remedy at law.

### 3. Likelihood of irreparable harm

 When deprivation of a constitutional right is shown, most courts require no further showing of irreparable harm before issuing a preliminary injunction. *See Goldie's Bookstore, Inc. v. Superior Court of California,* 739 F.2d 466, 472 (9th Cir.1984) (citing C. Wright & A. Miller, 11 *Federal Practice & Procedure* § 2948 at 440 (1973)). In *Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan,* 518 F.Supp. 993 (S.D.Tex.1981), the court issued a preliminary injunction preventing defendants from using "self help tactics of threats of violence and intimidation" to interfere with the rights of the plaintiffs during shrimping season. The court held that "[i]t is well established that victims of discrimination suffer an irreparable injury regardless of actual pecuniary damage." *Id.* at 1016.

In addition to plaintiffs' likelihood of success on their discrimination claims, they face irreparable harm from the continuing nature of the private defendants' illegal activities. *See New York State NOW,* 886 F.2d at 1362 (defendants' intent to continue blockades of abortion clinics in face of serious legal and financial consequences show continuing harm sufficient to justify injunction). It is the stated intent of STA to "minimize" the efforts of the spearers and to stop the harvest if possible. The illegal efforts of its members have not ceased even in the face of arrests. The record shows that plaintiffs will continue to suffer from the improper actions of the private defendants absent injunctive relief.

### 4. Balance of harms

The private defendants contend that the injunctive relief sought by plaintiffs will infringe on their right of free speech guaranteed by the First Amendment. However, the injunction granted in this order restricts actions of the private defendants that fall outside the scope of constitutional protection. *See Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan,* 543 F.Supp. 198, 208 (S.D.Tex.1982) (court enjoined defendants from engaging in acts of violence, intimidation or harassment against Vietnamese fishermen).

 The First Amendment does not "guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Soc'y for Krishna Consciousness,* 452 U.S. 640, 646–47, 101 S.Ct. 2559, 2563–64, 69 L.Ed.2d 298 (1981). Although the private defendants have the right to voice opposition to plaintiffs' exercise of their treaty rights, the First Amendment does not provide them with a right to threaten, assault or commit battery on plaintiffs. *See Northeast Women's Center, Inc. v. McMonagle,* 745 F.Supp. 1082, 1090 (E.D.Pa.1990); *see also NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 916, 102 S.Ct. 3409, 3427, 73 L.Ed.2d 1215 (1982) (First Amendment does not protect expressive conduct characterized by violence); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942) (First Amendment does not protect "fighting words," which inflict injury or tend to "excite an immediate breach of the peace"). Neither do the private defendants have a protected right to obstruct plaintiffs' access to the lake or spawning areas. *See Cameron v. Johnson,* 390 U.S. 611, 617, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182 (1968) (upholding law prohibiting conduct that obstructs or unreasonably interferes with ingress or egress to and from courthouse); *New York NOW,* 886 F.2d at 1364 (blocking access to public and private buildings not a proper method of communication); *United State v. Falk,* 479 F.2d 616, 620 n. 5 (7th Cir.1973) ("There is no constitutional right to ob-

1354

struct the passage of others or to engage in any manner of speech without regard to how it may interfere with the activities of other people in their businesses and homes"). I conclude that the injunction granted to plaintiffs in this order does not infringe on the private defendants' First Amendment rights. Thus, the balance of potential harm to the parties weighs in favor of issuing the injunction.

### 5. Public interest

■ The final prerequisite for a preliminary injunction is that it not harm the public interest. An injunction in this case would not harm the public interest, it would promote it. The public has a strong interest in protecting the rights of all persons from unlawful interference from others.

### C. Nature of Injunctive Relief

Much of plaintiffs' request for relief is framed as directives to the defendant sheriffs. Since plaintiffs failed to show any basis for entry of an injunction against these defendants, those portions of their request for relief cannot be granted. However, plaintiffs have shown cause for the entry of an injunction against the private defendants, prohibiting them from continuing to engage in acts intended to impede, deter or prevent plaintiffs from spearing.

■ The injunction is not intended to reach the private defendants' verbal insults, their taunts or their posters and literature. Plaintiffs have not asked for an injunction against the private defendants' verbal expression, recognizing that even vile, loathsome and hateful statements may be protected under the First Amendment. What plaintiffs do seek and what they have established they are entitled to, is an injunction against the physical acts of the private defendants: launching their boats and keeping them close to the landing so as to make it difficult for plaintiffs to move their spearing boats out to the spawning beds, creating hazardous wakes in the vicinity of plaintiffs' spearing boats, shining lights in the eyes of spearers and boat operators, playing leapfrog and otherwise

interfering with plaintiffs' boats, planting concrete walleye decoys in an effort to impede plaintiffs' spearing and break their spears, and assaulting or battering spearers or their family members at the boat landings.

### ORDER

IT IS ORDERED that plaintiffs' motion for a preliminary injunction against defendants James Williquette, David Enblom and Wayne Wirsing is DENIED; plaintiffs' motion for a preliminary injunction against the private defendants is GRANTED; defendants Stop Treaty Abuse–Wisconsin, Inc., Dean Crist, Al Soik, Elaine Soik, Wayne Pieper, Tommy Handrick, Glen Handrick, Howard Caputo, Charles Ahlborn, Mike Ahlborn, Jack Lanta, Rose Lanta, Lois Pavlovich, Charles Gilman, Brian Crist, Patrick Long and David Worthen, and all those acting in concert or at the direction of these defendants are enjoined preliminarily from

a) Assaulting or battering any member of the Lac du Flambeau band or any member of the family of a Lac du Flambeau band member at any landing or on any lake within the ceded territory;

b) Intentionally creating wakes on any waterway to interfere with any spearer;

c) Planting decoys in any waterway;

d) Intentionally blocking spearing boats from moving from the boat landings out to the spawning beds;

e) Shining lights into the eyes of any spearer or spearing boat operator while on the water;

f) Playing "leapfrog" with any spearing boat, or otherwise impeding the progress of any spearing boat; and

g) Taking any other action that is intended to or may reasonably be expected to interfere with plaintiffs' exercise of their spearing rights.